THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRYAN HALSTEAD, Defendant-Appellant.

Second District   No. 2—86—0740

Opinion filed December 21, 1987.

Thomas M. Walsh, of Downers Grove, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Bryan Halstead, was convicted after a bench trial of two counts of home invasion, eight counts of aggravated criminal sexual assault, two counts of aggravated battery, five counts of unlawful restraint, and one count of armed violence. Defendant was sentenced to concurrent terms of 30 years' imprisonment for one count of home invasion, 30 years' imprisonment for one count of aggravated criminal sexual assault, and three years' imprisonment for each count of unlawful restraint. He was also sentenced to a 15-year term of imprisonment on the armed violence count, to be served consecutively to the 30-year sentences. Defendant appeals challenging the severity of the sentences and the trial court's denial of defendant's motion to reopen the case for introduction of evidence regarding defendant's mental condition at the time of the offenses. We affirm.

Although defendant does not argue that he was not proved guilty beyond a reasonable doubt, we must still examine the facts of the offenses to determine if the sentences imposed are proper. All of the offenses here arose from defendant's day-long terrorization of the Balchs, an Aurora family, on August 26, 1985. Defendant at that time had been married to one of the Balch daughters, Pamela, for approximately one month, but defendant had filed for divorce, and Pamela was living with her family. Peggy Balch, Pamela's 13-year-old sister, testified that she was at home alone at approximately 11 a.m. that day when the doorbell rang. She could not see anyone from inside, so

she opened the door and saw defendant holding a bag. Defendant pulled a pistol from the bag and forced his way inside. Peggy ran through the house to a sliding glass door, when she heard a shot. She ran outside, but defendant caught her and forced her back inside. Peggy later found a bullet hole in the wall next to the glass door.

Defendant took Peggy through the house, making sure all the doors and windows were locked. During this time, defendant obtained a second pistol belonging to Peggy's father. A short time later, he took her to her bedroom where he sexually assaulted her, both orally and vaginally. Peggy testified that defendant had his pistol with him and that he had threatened to kill her. Defendant then took Peggy to the basement of the house, where he tied her up with rope he had brought with him in the bag.

Soon thereafter, Peggy's sister Wendy came home. She, too, was led to the basement at gunpoint and was likewise tied up. The girls' mother, Patricia Balch, was the next to return home. Like her daughters, she was taken to the basement and tied by defendant.

Pamela and her father, James Balch, arrived home at approximately 5:30 p.m. When they came inside, they were confronted by defendant, who pointed both pistols at Mr. Balch. Mr. Balch ordered defendant to leave, but instead, defendant shot Mr. Balch in the upper left arm. Pamela used her father's belt as a tourniquet for his arm, and defendant took them to the basement. Defendant allowed Mrs. Balch to be untied so she could help her husband, but defendant would not allow them to call an ambulance.

Defendant then took Pamela upstairs where they talked for several hours. During that time, defendant periodically checked on the family members in the basement. At approximately 9 p.m., defendant and Pamela returned to the basement. Defendant announced that he had decided to kill Pamela's family and pointed his gun at Mr. Balch. Mr. Balch asked that the family be allowed to pray together first. This led to defendant's eventually being convinced to let them call an ambulance. The Balchs agreed to tell the police the shooting was an accident in order to convince defendant to free them.

An ambulance finally arrived at the Balch residence at 10:30 p.m. When Mr. Balch was in the ambulance, he told a police officer that defendant had tried to kill him. Defendant was then arrested.

Defendant also testified to his version of the events of August 26, 1985. He testified that the sex acts committed with Peggy Balch were consensual and that he had shot Mr. Balch in self-defense. He testified that all he really wanted to do was to try to work out his marital problems with Pamela. Defendant was, nevertheless, convicted of the

charges as set forth above, although he was acquitted of two counts of attempted murder.

At defendant's sentencing hearing, the State presented victim impact statements of James, Patricia, Peggy and Pamela Balch. The statements set forth the psychological anguish the family members continued to suffer, as well as the effects of considerable permanent physical damage to James Balch's arm. Defendant offered in mitigation testimony of a psychiatrist, Dr. Lyle Rossiter, testimony from defendant's father, and a statement by defendant himself.

■■ ■ Defendant first contends that the 30-year sentences for home invasion and aggravated criminal sexual assault are excessive. It is true that all penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, §11; *People v. Crosser* (1983), 117 Ill. App. 3d 24, 31.) It is equally true, though, that the prime responsibility for striking the proper balance between these two factors rests with the trial court. *Crosser*, 117 Ill. App. 3d at 32.

■■ Furthermore, we are limited in the scope of our review. Our supreme court has repeatedly stated that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of such discretion, the sentence imposed by the trial court may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153.) The *Perruquet* court explained the rule thusly:

> "[T]he trial judge is normally in a better position to determine the punishment to be imposed than the courts of review. [Citations.] A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. [Citation.] Such a judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citation.] The trial judge, in the course of the trial and the sentencing hearing, has an opportunity to consider these factors 'which is superior to that afforded by the cold record in this court.' (*People v. Morgan* (1974), 59 Ill. 2d 276, 282.)" *Perruquet*, 68 Ill. 2d at 154.

■■ ■ Under these guidelines, we may not modify the sentences imposed by the trial court unless the punishment clearly departs from fundamental law, its spirit and purpose, and the constitutional requirement that the sentence must reflect the nature of the offense and the possibility of rehabilitation. (*People v. Shumate* (1981), 94 Ill. App. 3d 478, 484-85.) If a sentence reflects both the seriousness of the offense and gives adequate consideration to the rehabilitative po-

6

tential of the defendant, it will not be disturbed on review. (*People v. Carlson* (1980), 79 Ill. 2d 564, 587.) Defendant here admits that the trial court gave proper consideration to the seriousness of the offenses but argues that the court either disregarded or misinterpreted evidence of defendant's rehabilitative potential.

■■ The trial court found that defendant has a serious mental illness, a personality disorder, and that the chances of successful treatment with respect to that disorder are not great. Defendant argues that this finding is contradicted by Dr. Rossiter's testimony, pointing to the following colloquy between the trial court and the doctor:

"THE COURT: In the broadest terms, Doctor, at this point in time, to generalize, you feel that the defendant has a mental illness?

THE WITNESS: It is certainly a *bona fide* mental illness in psychiatric terms, Judge.

THE COURT: All right, and that mental illness is apparently subject to some type of treatment program?

THE WITNESS: That's correct.

THE COURT: Success of the treatment program is not great, though? There is a reasonable chance of some type of improvement with treatment?

THE WITNESS: That is always correct, yes.

THE COURT: All right. I have no—I have nothing further."

From this isolated exchange, defendant concludes that the trial court misinterpreted Dr. Rossiter's analysis of defendant's chances for improvement. After reviewing the transcript of the entire sentencing hearing, however, we do not believe that the trial court misconstrued Dr. Rossiter's testimony.

Prior to the above-quoted summary of Dr. Rossiter's opinion, he had testified in more detail to defendant's condition. Dr. Rossiter described defendant as afflicted with a borderline personality disorder with narcissistic and sociopathic features, a condition he termed "lifelong." He testified that someone with such a disorder is "quite hostile, manipulative, highly unstable in a variety of adult life [*sic*], including occupational endeavors, interpersonal relationships, social relationships, and a tendency to be affectively or emotionally unstable." Dr. Rossiter also stated that persons with this type of disorder tend to be quite impulsive and that there is also a prominent tendency towards hostility.

Dr. Rossiter elaborated on defendant's condition. The narcissistic aspect of the diagnosis is characterized by an unusual degree of self-centeredness and a tendency to be exploitive in relationships with oth-

ers. The antisocial aspect refers in this case to an inclination to disregard the rights of others and to violate them. Dr. Rossiter opined that these conditions are "quite severe" in this defendant. The doctor went on to testify that, while defendant would probably not direct his violence toward strangers or random individuals, defendant's dangerousness would develop in a relationship in which he is heavily emotionally invested. Dr. Rossiter added that defendant is capable of developing more such relationships, even in an employment setting, and that he could manifest violence in the future.

On cross-examination, Dr. Rossiter agreed that defendant has vicious and sadistic qualities. He also noted that defendant makes no spontaneous actions of remorse and tends to justify the offenses based on perceived injustices received at the hands of others. The doctor also stated that the fact that defendant would not admit responsibility makes him a more dangerous person.

Regarding defendant's prospects for rehabilitation, Dr. Rossiter recommended long term residential psychotherapy. Ideally, such treatment would take place in an institution specializing in such therapy, but even then treatment would take many years. Although the doctor did not believe that such treatment is available in the Department of Corrections, he testified that it is possible that defendant would benefit from the treatment programs available in the Department of Corrections. He also testified that defendant's basic personality disorder would not be altered significantly by a long period of incarceration. Finally, just before the above-quoted exchange with the trial court, Dr. Rossiter testified that defendant's condition will be lifelong, unless it is subject to intense treatment.

Based on the foregoing, we cannot conclude that the trial court erred in finding that defendant has little potential for rehabilitation. Dr. Rossiter's testimony indicates that the likelihood of successful treatment is not great and that such treatment would, in any event, be long term. In the meantime, defendant's potential for violence remains high. Thus, we conclude that Dr. Rossiter's agreement with the trial court that there is a chance of "some type of improvement" with intensive, long-term treatment does not contradict the court's finding regarding defendant's rehabilitative potential.

■■ Defendant also argues that the trial court abused its discretion in that it ignored other mitigating factors in imposing the 30-year sentences. Defendant notes that he was only 21 years of age at the time of the offenses and had no prior criminal record. He points out his history of psychiatric problems and that he had sought psychiatric help some time before the offenses. He states that he was gainfully

employed and had a good educational background. He also terms significant his family's continued support and that he acknowledged his need and desire for treatment.

Our review of the record reveals no abuse of discretion. The mitigating factors mentioned above were set forth in the presentence report and were argued by counsel. The trial court indicated that he did read the presentence report. He was not then obligated to recite and assign a value to each fact presented in evidence at the sentencing hearing. (*People v. Meeks* (1980), 81 Ill. 2d 524, 534.) Furthermore, "if the trial court has articulated an aggravating factor or factors, it will be presumed that the trial court has considered any mitigation evidence as well, absent any indication to the contrary, other than the length of the sentence." (*People v. Ulmer* (1987), 158 Ill. App. 3d 148, 151.) The aggravating factors the trial court considered here included the permanent physical harm to James Balch and the psychological trauma endured by the entire Balch family, both proper aggravating factors for the court to consider. (*Ulmer*, 158 Ill. App. 3d at 151.) We therefore presume that the trial court considered the mitigation evidence presented.

■■ We conclude by noting that while the trial court is required to consider the defendant's rehabilitative potential in imposing sentence, "such consideration need not outweigh the seriousness of the offense or other aggravating factors." (*People v. Brajcki* (1986), 150 Ill. App. 3d 506, 515.) The seriousness of defendant's offenses here and the accompanying aggravating factors are manifest. As our supreme court has admonished, "[i]t is not our function to serve as a sentencing court, and we will not substitute our judgment for that of the trial court merely because we feel that we would have imposed a different sentence had that function been delegated to us." (*Perruquet*, 68 Ill. 2d at 156.) Considering the entire record, we hold that the trial court did not abuse its discretion in sentencing defendant to 30-year concurrent terms for home invasion and aggravated criminal sexual assault.

■■ Defendant's next argument is that the trial court erred in imposing a 15-year sentence for armed violence to run consecutively to the 30-year sentences. Section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b)) does limit the circumstances under which consecutive sentences may be imposed:

> "The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which

the court shall set forth in the record."
This section, however, "requires only that 'the record show that the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public.' " (*People v. Steppan* (1985), 105 Ill. 2d 310, 322, quoting *People v. Pittman* (1982), 93 Ill. 2d 169, 178.) The trial court here found such circumstances to exist, stating: "Based on the history and character of the defendant, I am of the opinion that [a] consecutive sentence is required to protect the public from further criminal conduct."

■■ Defendant argues, though, that there is insufficient evidence here to support the trial court's conclusion. Defendant notes that Dr. Rossiter only said it was "possible" that defendant would be violent again. Defendant thus contends that the mere possibility of future criminal conduct is not a sufficient basis for imposition of a consecutive sentence, but that the evidence must show that it is likely or highly probable that he will commit crimes in the future.

We reject this argument. First, defendant cites no authority for this proposition. Second, Dr. Rossiter's testimony clearly indicates that defendant is capable of violence in the future and that this capability may very well be lifelong. In these circumstances, we do not believe a more firm prediction of future criminal activity is necessary.

■■ Nevertheless, defendant urges this court to reduce the sentence, citing *People v. Gray* (1984), 121 Ill. App. 3d 867. In *Gray*, the appellate court concluded that the trial court erred in imposing a consecutive sentence for concealment of a homicidal death, in addition to a sentence for involuntary manslaughter. (*Gray*, 121 Ill. App. 3d at 873.) In that case, defendant caused the death of his wife's 2½-year-old child, and then, with his wife's help, concealed the body in a nearby building. Although the killing itself was termed "reprehensible," the court found that the treatment of the body alone was not a sufficient showing that a consecutive sentence was necessary for the protection of the public. (*Gray*, 121 Ill. App. 3d at 873.) Here, in contrast, Dr. Rossiter's testimony readily demonstrates that defendant poses a threat of future harm to the public. Since there was no such testimony in *Gray*, that case is clearly distinguishable.

We are aware of statements to the effect that consecutive sentences should be imposed rarely. (See, *e.g.*, *People v. Griffin* (1982), 113 Ill. App. 3d 184, 193.) Even so, the trial court's sentencing decision will not be disturbed on review absent an abuse of discretion. (*Steppan*, 105 Ill. 2d at 323.) It appears to us that the trial court here properly considered the nature and circumstances of the offenses, as well as defendant's character, and reasonably concluded that the pub-

lic needs protection from further criminal conduct of the defendant. As such, we find no abuse of discretion in the imposition of a consecutive sentence for armed violence.

▆▆▆ Defendant's final argument is that the trial court abused its discretion in denying the defense motion to reopen its case for the purpose of introducing evidence that defendant was mentally ill at the time of the offenses. Prior to trial, defendant was examined by Dr. Rossiter. Dr. Rossiter found that defendant was fit to stand trial and that defendant was not legally insane at the time of the offenses, although defendant did have a personality disorder. At trial, defendant did not assert an insanity defense, nor, of course, did he plead guilty but mentally ill. Rather, his defense was that the entry to the Balch home and the sexual assault were consensual and that the shooting of James Balch was in self-defense. No evidence of mental illness was offered at all.

After Dr. Rossiter testified at the sentencing hearing, however, defendant moved to reopen his case so that Dr. Rossiter's testimony could be admitted for the purpose of finding defendant guilty but mentally ill. (See Ill. Rev. Stat. 1985, ch. 38, par. 115—3(c).) The trial court denied that motion based on the statutory language and the holding of *People v. Testa* (1984), 125 Ill. App. 3d 1039. Defendant's subsequent motions to hold a hearing to determine if he was mentally ill and to reopen the defense case were likewise denied.

We believe the trial court properly denied defendant's motions. Section 6—4 of the Criminal Code of 1961 provides that "mental illness is not an affirmative defense, but an alternative plea or finding that may be accepted, under appropriate evidence, when the affirmative defense of insanity is raised or the plea of guilty but mentally ill is made." (Ill. Rev. Stat. 1985, ch. 38, par. 6—4.) Furthermore, section 115—3(c) of the Code of Criminal Procedure of 1963 provides that the court may find a defendant guilty but mentally ill "[w]hen the defendant has asserted a defense of insanity." (Ill. Rev. Stat. 1985, ch. 38, par. 115—3(c).) As previously noted, defendant here neither raised an insanity defense nor introduced evidence of mental illness, so under the explicit terms of the statutes, a finding of guilty but mentally ill was not available. *Testa*, 125 Ill. App. 3d at 1052.

We find defendant's attempts to distinguish *Testa* unavailing. As in *Testa*, defendant here was in reality attempting to change after trial his plea from not guilty to guilty but mentally ill. Such a plea can only be made before or during trial. (Ill. Rev. Stat. 1985, ch. 38, par. 115—2(b).) Also, we do not believe that because *Testa* involved a jury trial, a different result is required here. The statutes clearly require,

in both bench and jury trials, a plea of insanity or guilty but mentally ill before a judgment of guilty but mentally ill can be entered. Nor do we believe that defendant's request for a pretrial fitness examination is the equivalent to an assertion of the insanity defense, especially since no evidence in that regard was offered at trial. Finally, although the *Testa* court noted that the evidence adduced at the sentencing hearing there did not convince the trial court that the defendant was mentally ill, in contrast to the trial court's reaction here, the *Testa* holding was based on statutory construction, not evidence. (*Testa*, 125 Ill. App. 3d at 1052.) Accordingly, we conclude that the trial court here properly denied defendant's motions to reopen the case.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

HOPF and INGLIS, JJ., concur.