THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK GLEASON, Defendant-Appellant.

First District (1st Division)   No. 1—91—0628

Opinion filed December 28, 1992.

---

[2]Justice Linn participated in the disposition of this case prior to his retirement.

CAMPBELL, J., dissenting in part.

Genson, Steinback & Gillespie, of Chicago (Jeffrey B. Steinback and Leonard C. Goodman, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, Deborah Alexander, and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

After a bench trial, defendant Patrick Gleason was found guilty of attempted murder, armed violence and aggravated battery. The circuit court sentenced defendant to an extended term of 40 years' incarceration. Defendant appeals his conviction and sentence. We affirm defendant's conviction and reduce his sentence to 30 years' imprisonment.

Officer Frank Costa testified that on March 11 and 12, 1989, he worked as a police officer from 11 p.m. to 7 a.m. Costa testified that when he went off duty he placed his weapon in his locker along with his rig and put on his regular street jacket. On March 12, at approximately 7:15 a.m., Costa left the police station and went across the street to the Stay Out All Night Discotheque (Stay Out). After Costa had been at the Stay Out for about five minutes, someone informed him that there was a fight at the front door. Costa saw the doorman, Jeff Karris, outside with someone else on the ground. The man on the ground stated that he "didn't want no problems. He just wanted to get up and leave." Costa testified that he helped the man up off the ground and the man left. Then, Costa went back into the bar and sat on a bar stool about six feet from the doorway.

Costa further testified that at approximately 7:50 a.m., defendant entered the bar and was walking in when Karris approached him. Karris informed defendant that the bar was closed. Defendant "karate chopped" Karris, causing him to fall to the ground. Defendant then pulled out a gun. Costa testified that he shouted to warn Karris of the gun. Defendant aimed the gun at Costa and shot him in the left arm and chest. Costa heard a total of three shots. Costa attempted to follow defendant out the door in order to get a license plate number, but failed. Thereafter, Costa went to the police station and informed

them of the shooting before collapsing on the floor. As a result of his gunshot wound, Costa underwent three bone graft surgeries on his arm and one surgery on his chest. The State and defendant stipulated that Costa's left lung collapsed and that bullet fragments were and still are embedded in the apex of that lung. Costa identified defendant in a photo lineup.

Next, Karris testified that on March 11 and 12, 1989, he was employed and working at the Stay Out. Karris stated that at about 7:15 a.m. on March 12 he overheard an argument at the front door of the bar. Karris saw Mika Gleason holding a doorman's arms after he was told the bar was closed. Karris claims that he was attempting to talk Mika into going home, when Mika knocked him to the ground. Karris explained that a fight ensued until Mika retreated.

Karris further testified that at approximately 7:45 a.m., defendant walked into the Stay Out. Karris told defendant that the bar was closed and that he was not allowed to come into it. Then, defendant shoved Karris with his left hand, while his right hand pulled out a gun. Karris testified that he turned to run, but was shot. Karris had to scoop up his insides and place them back into his body. The gunshot hole in Karris' side was about the size of his fist. Karris was taken to Loyola Hospital and remained there for 21 days. Karris endured at least three surgeries and was in and out of a coma for four to five days.

Michael Griffin also testified on behalf of the State. Griffin testified that on March 11, 1989, he went to a bar, Cocos, in Melrose Park and had a couple of beers and some shots of Jack Daniels and tequila. In the early morning hours of March 12, 1989, Griffin left Cocos with Robert Moreno and went to Interactions, another bar. At Interactions, Griffin met Mika Gleason. Later, Griffin, Moreno and Mika went to the Stay Out. When they arrived at the Stay Out, the doorman informed them that the bar was closed. Mika persisted in telling the doorman that he needed to find someone in the lounge. Mika began pushing people to get into the bar. The doorman held Mika on the ground. Later, Mika returned to the car and told Griffin that he was going to get his brother.

Mika got defendant and went back to the Stay Out. Defendant stated to Griffin that he just wanted to find out who beat up his brother. Griffin testified that defendant walked into the Stay Out and seconds later Griffin heard gunshots. Griffin further testified that defendant came out of the bar, shaking and sweating. Defendant pointed the gun at Griffin and told him "[y]ou didn't hear nothing, see nothing." Defendant later stated to Griffin that he thought he shot a

police officer. Additionally, Griffin testified that he called 911 and made a report to the Elmhurst police department concerning the incident. Griffin identified defendant in a lineup.

Mary Karris, Jeff Karris' wife, testified that she was working at the Stay Out as a bartender the morning her husband was shot. Mary testified that at about 7:50 a.m., on March 12, 1989, she saw defendant raise a gun in his right hand. She dove under the bar, heard three shots and then heard someone say that "he was gone." As she rose off the floor she heard someone say that her husband had been shot. Mary saw that her husband was pale, holding his side and perspiring tremendously. Mary identified defendant from a photograph.

William Robinette, manager of the Stay Out, Amaira Del Prete and Carolyn Dubiel, waitresses there, and Patricia Diane Story, a bartender there, also testified for the State. Robinette's, Prete's, Dubiel's and Story's testimonies corroborate that of other witnesses. All four of the above witnesses identified defendant in a lineup.

Last, Officer James Jasinski testified for the State that he had been dispatched to a fight at the Stay Out on March 12, 1989. When Jasinski arrived he saw Costa and Karris bending in a downwards position. By the time he exited his squad car, a man got off the ground and began to walk away. Then, Jasinski left the scene. Jasinski testified that at about 7:50 a.m. he received another dispatch message that a man had been shot at the Stay Out and that Costa had also been shot and was presently at the police station.

Mika Gleason was the first witness to testify for the defense. Mika testified that at approximately 7:10 a.m. on March 12, 1989, he walked into the Stay Out. A doorman informed Mika that the bar was closed. Mika testified that he requested permission to look for his friend's girl friend. Mika claims that the doorman would not permit him to go any further and that he pushed Mika. Thereafter, Mika grabbed the doorman by his arm and pushed him. Mika then testified that he was pushed and kicked out of the bar and beaten up. Mika told his friend to take him home because he was "going to get a gun" and "come back and kill these guys."

Mika further testified that he arrived at home at about 7:30 a.m., ran upstairs and grabbed a rifle from underneath his bed. Defendant, his brother, was sleeping in the bed at that time. Defendant woke up and Mika told him that five men had beaten him up. Defendant took the gun from Mika. Defendant left the house. Mika testified that police woke him up and informed him that they believed defendant had been involved in a shooting.

Defendant testified on his own behalf. Defendant stated that he was 26 years old and living with his parents. Defendant also stated that he had completed two years of high school. Defendant testified that he had been employed by Boyer Beason Vanlines as a furniture mover for the past 10 years.

Defendant explained that in the morning hours of March 12, 1989, he was awakened by his brother loading his HK 91 assault rifle. Defendant noticed Mika's eye was swollen closed and that his mouth was bleeding. Defendant took the weapon from Mika when Mika indicated that he was going to the Stay Out to kill the people that had beaten him up. Defendant put the rifle away and went into the living room to get his pistol. Defendant tucked the .44 Magnum pistol into the left side of his pants, after making sure it was loaded. Defendant stated that he was fully prepared to use the weapon if necessary. Moreno drove defendant to the Stay Out and parked in the driveway about seven to eight feet from the left of the entrance.

Further, defendant testified that upon arriving at the Stay Out, the door was closed. Defendant testified that he entered the bar and Karris physically stopped him by placing his hands on both of defendant's shoulders. After Karris grabbed him, defendant hit Karris, causing him to fall. Defendant stated that then he saw a man in dark clothes lifting an object. Defendant claims that he felt his life was in danger so he drew his pistol and fired it. Finally, defendant testified that he, accompanied by his attorney, surrendered himself to the Cook County sheriff's police.

■ First, defendant argues that the circuit court improperly allowed Robert Moreno to refuse to testify under the fifth amendment right against self-incrimination. In order to sustain an invocation of the fifth amendment, the circuit court needs only to determine whether there is a reasonable basis for believing that a danger to a witness may exist in answering questions. (*Bradford v. Soto* (1987), 159 Ill. App. 3d 668, 512 N.E.2d 765.) Furthermore, when balancing the sixth amendment right to compulsory process and the fifth amendment right against self-incrimination, the circuit court must make an appropriate inquiry. *Bradford*, 159 Ill. App. 3d 668, 512 N.E.2d 765.

■ In the case at bar, the circuit court did make the appropriate inquiry. The court also allowed defendant to supply it with case law and make an offer of proof. After hearing testimony and argument on the matter, the circuit court ruled that Moreno's name had been mentioned on numerous occasions during testimony in a certain manner and in certain contexts that "if he did take the stand, whatever he

said knowing the potential questions of both state and defense, that he would, if he testified, incriminate himself and open himself to possible charges against him." There is no evidence that the circuit court abused its discretion by allowing Moreno to invoke his fifth amendment right.

■ Defendant's second argument is that the circuit court improperly questioned defendant, defendant's father and Mika, thereby assuming the role of prosecutor and, thus, denying him a fair trial. Initially, the State argues that this issue is waived because defendant failed to object at trial to this questioning. We disagree. The general rule that errors not objected to at trial are waived is inapplicable where the complained-of error is a circuit court's improper questioning of witnesses. (*People v. Johnson* (1980), 83 Ill. App. 3d 586, 404 N.E.2d 531; see also *People v. McGrath* (1967), 80 Ill. App. 2d 229, 224 N.E.2d 660.) In a bench trial, a defendant may be reluctant to interrupt the court's interrogation for fear of antagonizing the judge. *Johnson*, 83 Ill. App. 3d 586, 404 N.E.2d 531.

■ ■ Since this issue has not been waived, we have reviewed it and find that the circuit court did not err by questioning witnesses. A circuit court may question witnesses for the purpose of eliciting the truth or clarifying obscure issues. (*People v. Murray* (1990), 194 Ill. App. 3d 653, 551 N.E.2d 283.) In fact,

" '[i]t is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice[.]' " (*Murray*, 194 Ill. App. 3d at 658, 551 N.E.2d at 287, quoting *People v. Franceschini* (1960), 20 Ill. 2d 126, 132, 169 N.E.2d 244, 247.)

The court's questioning of Moreno for the purpose of ascertaining why the witness seeks to invoke his fifth amendment right clearly is not improper, but rather is required. (See *Bradford*, 159 Ill. App. 3d 668, 512 N.E.2d 765.) The other complained-of questioning by the court took place during the sentencing phase of the trial. A trial judge is permitted to ask questions during the sentencing phase because he has the prime responsibility of striking a proper balance between the seriousness of the offense committed and the objective of restoring the offender to useful citizenship. *People v. Halstead* (1987), 164 Ill. App. 3d 1, 517 N.E.2d 667.

■ Next, defendant argues that the circuit court was biased against him because it restricted evidence favorable to the defense,

namely that a witness had a previous conviction and an alleged bias. The State stipulated at trial to the fact that Griffin was serving misdemeanor probation for driving under the influence. The court stated that such evidence was irrelevant because the witness admitted that he had drunk alcoholic beverages the night of the shootings. Defendant's argument that he was entitled to explore the witness' predisposition to testify favorably for the State is meritless since the record is devoid of any indication that defendant attempted any such inquiry. For example, defendant never asked Griffin whether he was charged with any offense related to the circumstances of this case. Defendant also alleges that the trial judge was biased because he allowed descriptions of the victims' wounds. Defendant, however, fails to cite to the record as to where this allegedly improper testimony is contained in violation of Supreme Court Rule 367(b). (134 Ill. 2d R. 367(b).) The record does not indicate that the trier of fact was biased against defendant so as to deny him a fair trial.

■ Defendant's next contention is that the circumstances surrounding the attempted murders do not warrant imposing an extended term. A defendant may be sentenced to an extended term for committing attempted murder if certain factors in aggravation are present. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—2, 1005—5—3.2(b).) We note that the circuit court found that defendant's crime was accompanied by exceptionally brutal or heinous behavior, a statutory aggravating factor which allows the circuit court to sentence a defendant to an extended term. See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2).

The Illinois Supreme Court explained that "heinous" is "defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, 431 N.E.2d 344, 353.) In imposing the sentence, the circuit court referred to defendant's use of a .44 Magnum, the extent of the victims' injuries and the fact that defendant did not call the police as justification for the extended term.

■ Defendant is a first-time offender. The trial judge conceded that defendant comes from a loving family and still lives with his parents. Defendant has been employed by the same company for 10 years. Moreover, at sentencing, 40 people were present to testify to defendant's good character. Defendant showed remorse for his actions and the pain it has and will cause the victims, their families and his family. Additionally, at trial, defendant testified that he feared for his

life and that the circumstances under which he went to the Stay Out were emotionally charged.

An extended-term sentence is reserved for crimes involving *exceptionally* brutal or heinous behavior. In *La Pointe*, the supreme court upheld that extended-term sentence because the defendant had a "significant history of criminal activity, acted with premeditated, cold-blooded deliberation in deciding to kill a cab driver \*\*\*. \*\*\* [W]hile being held in the county jail, he displayed a callous attitude and complete lack of remorse by wearing the tee shirt with the words 'Elmhurst Executioner' appearing thereon." (88 Ill. 2d at 501.) Defendant's crime caused grievous injuries, but we hold that the circuit court abused its discretion by finding that defendant acted in an exceptionally brutal and heinous manner.

Reviewing courts have the power under Supreme Court Rule 615(b)(4) to reduce the punishment imposed by the trial court. (134 Ill. 2d R. 615(b)(4).) We, therefore, reduce defendant's extended 40-year term to the maximum term for attempted murder, 30 years' incarceration.

■ Lastly, defendant argues that his trial counsel's failure to call witnesses and cross-examine a witness amounted to ineffective assistance of counsel. In order for defendant to prove a claim of ineffective assistance of counsel, he must show that his counsel's presentation fell below an objective standard of reasonableness such as to deprive defendant of a fair trial and that there is a reasonable probability that, but for the attorney's unprofessional errors, the results of the proceedings would have been different. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246; *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) When reviewing trial counsel's behavior, we indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Trial counsel's performance must be evaluated on the basis of the entire record. (*People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481.) Defendant's trial counsel prepared pretrial motions for discovery, made a clear opening statement which foreshadowed a defense that defendant did not have the requisite intent to commit attempted murder, made numerous objections during the prosecution's direct examination of witnesses and made a strong closing argument. After reviewing the record, we find that defendant's trial counsel's participation and performance constituted vigorous and effective representation. (See *People v. Colley* (1988), 173 Ill. App. 3d 798, 528

N.E.2d 223.) Moreover, defendant must prove that but for counsel's alleged errors, the outcome of the trial would have been different. Defendant cannot prove this. The evidence against defendant is overwhelming. Defendant, himself, testified that he checked to make sure the pistol was loaded before he took it to the Stay Out and, furthermore, that he was prepared to use it. Defendant has failed to show how trial counsel's alleged errors prejudiced him. We hold that defendant received effective trial counsel.

For the foregoing reasons, the conviction of the circuit court of Cook County is affirmed and the sentence of the circuit court of Cook County is reduced from an extended-term sentence to a maximum term of 30 years' imprisonment.

Affirmed and sentence reduced.

MANNING, J., concurs.

JUSTICE CAMPBELL, dissenting in part:

I concur in the majority opinion affirming defendant's conviction; however, I respectfully dissent from that part of the opinion which reduces defendant's extended-term sentence from 40 years' to 30 years' imprisonment.

The standard of review to be applied in determining whether a sentence is excessive is whether the trial court abused its discretion in imposing the sentence. (*People v. Timmons* (1992), 233 Ill. App. 3d 591, 598, 599 N.E.2d 162, 167; *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) The trial court is in the best position to make a reasoned judgment as to a sentence which balances the need to protect society and rehabilitate the offender, and its judgment is due great weight and deference. *Timmons*, 233 Ill. App. 3d at 599, 599 N.E.2d at 167-68.

The record shows that defendant was convicted of attempted murder, which is a Class X felony punishable by a term of not less than 6 years and not more than 30 years. (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4, 1005—8—1(3).) The statutory extended-term provision allows a trial court to impose an extended-term sentence upon a defendant convicted of any felony where "the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2 (b)(2).) In evaluating the brutality and heinousness of a defendant's conduct, the entire spectrum of facts surrounding the given incident must be analyzed. (*People v. McGee* (1984), 121 Ill. App. 3d 1086, 1089, 460

N.E.2d 843.) A court need not find that a defendant inflicted "torture or unnecessary pain upon his victim" in order to find "brutal" or "heinous" behavior (*La Pointe*, 88 Ill. 2d at 501); a single act which causes death or injury may be sufficient to demonstrate exceptionally brutal or heinous behavior considering the entire conduct of defendant. *McGee*, 121 Ill. App. 3d at 1090-91.

In the present case, the record shows that defendant's shooting of the two victims was premeditated, in apparent retribution over an argument between Mika Gleason and Karris. The trial court considered defendant's testimony that on the morning of March 12, 1989, defendant told his brother, Mika, not to go back to the Stay Out, that he would go to see what was happening. Defendant then retrieved a loaded .44 Magnum revolver from his closet. The trial court noted, "He has taken one of the most dangerous weapons, *** a .44 Magnum ***. If people are standing in the right position you can shoot four of them at the same time, that is how powerful this gun is." Defendant testified that he was prepared to use his weapon. There was no evidence in the record of any immediate provocation of defendant by either victim, both of whom were unarmed.

The record further shows that defendant gave Karris a "karate chop" in the neck, which knocked him to the ground, and then shot and "brutally injured" both Karris and Officer Costa at close range, leaving Karris with "his guts hanging out" of his stomach. The trial court noted that each victim required multiple surgeries and that each would be "scarred for life." Following the shooting, defendant did not go to the police, and initially threatened Michael Griffin at gunpoint, telling him to say nothing to the authorities.

Under these circumstances, it is my opinion that the trial court did not err in finding defendant's conduct exceptionally brutal and heinous and sentencing him to an extended term of imprisonment.

For the above reasons, I would affirm defendant's extended-term sentence of 40 years' imprisonment.