THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK MASOR (Impleaded), Defendant-Appellant.

First District (3rd Division)   No. 1—87—2081

Opinion filed August 28, 1991.—Rehearing denied November 18, 1991.

Randolph N. Stone, Public Defender, of Chicago (Stephen L. Richards, Assistant Public Defender, of counsel), for appellant.

John M. O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Paul Gliatta, and John deGrasse, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a joint bench trial, defendant Mark Masor was found guilty of delivery of a controlled substance and sentenced to serve a six-year prison term. His codefendant and father, Edward Masor, was also found guilty. Edward is not a party to this appeal. On appeal, Mark argues that (1) the trial judge erroneously excluded expert psychological testimony demonstrating his susceptibility to entrapment; (2) he was not proven guilty beyond a reasonable doubt; and (3) the State's involvement in his arrest constituted outrageous governmental conduct which violated his right to due process of law. We affirm.

The State presented the following evidence at trial. On January 9, 1985, Brent Fowlar, a Skokie village detective assigned to the Northeastern Metropolitan Drug Enforcement Group (NEMEG), met with Officer Rafael Tovar of the Des Plaines police department, a group supervisor for NEMEG; William Plahm, a Cook County sheriff's police officer assigned to NEMEG; and Al Osslund, a confidential police informant. The parties arranged to execute an undercover drug buy and surveillance to be arranged by Osslund.

At 6:40 p.m. that evening, Tovar went with NEMEG Agent Plahm to the 2700 block of Pine Grove in Chicago to conduct the undercover surveillance. Osslund accompanied Agent Fowlar, who drove an undercover vehicle to 2727 Pine Grove, where they picked up Mark and Edward, who were waiting in the vestibule of the building at that address. Edward Masor directed Fowlar to a house where they could purchase drugs. Fowlar drove Mark and Edward to the 2700 block of Berwyn. When they arrived, Edward told Fowlar to wait in the car while he entered a building located at 2707 West Berwyn. Tovar watched these activities from his car.

.

After a short while, Edward returned to the car and gave Fowlar a bag containing what was later determined to be 0.9 grams of cocaine. Fowlar gave Edward $100 in prerecorded funds. Thereafter, Edward went back into the apartment building. When he returned, he told Fowlar that the cocaine was high quality and that he could obtain more. Mark told Fowlar that he could deliver as much cocaine as he wanted. Fowlar drove Mark and Edward to a bus stop at Foster and Western Avenues. After Fowlar gave the two men an undercover telephone number, and discussed future drug purchases, Mark stated that he would call Fowlar later to see if he liked the cocaine, and Mark and Edward exited the car. Later that evening, Tovar met with Fowlar and Osslund. Fowlar showed the other two men a plastic bag containing one gram of cocaine that he had purchased from Edward.

At approximately 10:30 p.m. that night, Fowlar received a call from Mark, who asked him how he liked the cocaine. Fowlar told Mark that he would like to purchase two additional ounces of cocaine and Mark told him that the price would be $3,300.

The next day, Fowlar met Mark in front of a taco stand near Berwyn and Lincoln Avenues. Tovar and Plahm watched Mark and Fowlar from a parked car. Mark entered Fowlar's car and directed him to a parking space in a nearby lot. Mark asked to see the money, and Fowlar showed him the cash. Thereafter, Mark exited the car and entered the taco stand. Agent Plahm followed Mark into the restaurant and observed him talking on a public telephone. While Plahm was standing approximately 10 feet away, he overheard Mark say into the receiver, "What do you want me to do? I have a car."

After Mark returned to Fowlar's car, he told him that his father, Edward, would bring the cocaine. Edward subsequently arrived, entered the vehicle, and asked Fowlar to pull into an alley. When Fowlar refused, Edward left the vehicle and returned later in a blue car driven by John Waullowender. Edward took a bag from Waullowender and entered Fowlar's car. Edward gave Fowlar the plastic bag, which was later determined to contain 51 grams of cocaine, and Fowlar gave Edward $3,300. Fowlar then signaled his fellow officers, and Mark and Edward were arrested. The $3,300 was recovered from Edward.

Edward Masor testified that he had known the State's confidential informant, Al Osslund, for two months. During that period, he exchanged his cocaine for Osslund's heroin on numerous occasions. Edward further testified that on January 5, 1985, Osslund attempted to purchase cocaine from him and his son, Mark. He testified that after he refused several times, Osslund told him that he would not be given

any more heroin. He testified that, because Osslund was his only source of heroin, he agreed to get cocaine for him. Edward admitted that he arranged for the sale of one gram of cocaine to Fowlar on January 9, 1985, but he did not profit from the sale. Edward stated that, thereafter, Fowlar called him at home and asked him to obtain two kilos of cocaine. When Edward laughed at the request, Fowlar requested two ounces instead, and Edward reluctantly agreed after Fowlar stated that he would give him some of the cocaine.

Mark testified that he had known Al Osslund for five years prior to the incident. He further testified that Osslund introduced him to heroin and that he and Osslund used heroin together on a number of occasions. During this time period, Osslund and Mark exchanged or shared, but never sold, drugs to each other. On January 5 or 6, 1985, Osslund asked Mark and his father to help him purchase cocaine. Mark testified that both he and his father initially refused, but finally agreed when Osslund threatened to discontinue their heroin supply. Mark, who was 22 years old at the time of his arrest, testified that he had been a habitual drug user for the past 11 years.

Mark attempted to introduce the testimony of Mary Larsen, a drug counselor at Parkside Medical Center. The State objected to her testimony, and the trial court sustained the objection. Defense counsel made an offer of proof that if Mary Larsen were called to testify, she would state that a person in Mark's situation would feel that he had no alternative but to get involved in the sale of narcotics when threatened with the discontinuation of his drug supply.

Following closing arguments, the trial court found Mark guilty and sentenced him to serve a term of six years' imprisonment. This appeal followed.

On appeal Mark first argues that the trial court erred in excluding expert psychological testimony on the issue of his susceptibility to entrapment. We disagree.

■ Expert testimony is properly admissible when the subject matter is sufficiently beyond the common experience of ordinary lay individuals such that only persons of a particular skill or experience are capable of forming a judgment based on the facts presented. (*People v. Cole* (1988), 170 Ill. App. 3d 912, 929, 524 N.E.2d 926, 936.) An expert whose qualifications and experience give him or her knowledge which is beyond the ken of the average fact finder and whose testimony will aid, and not invade, the province of the fact finder in reaching its decision, should be allowed to testify. (*People v. Barber* (1983), 116 Ill. App. 3d 767, 776, 452 N.E.2d 725, 730.) Whether an expert is qualified to testify is within the sound discretion of the trial court,

and its decision will not be overturned absent an abuse of discretion. *People v. Sequoia Books, Inc.* (1988), 172 Ill. App. 3d 627, 638, 527 N.E.2d 50, 57.

■ Here, Larsen's testimony was properly excluded. Expert testimony was not required to determine that, based on Mark's history of drug abuse, he would feel that he had no choice other than to facilitate an illegal drug transaction when faced with the discontinuation of his drug supply. Indeed, Larsen's testimony would have gone beyond assisting the fact finder and would have instead invaded its province.

The trial court could not have reached its decision without considering Mark's testimony that he had been a drug addict for 11 of his 22 years. It was obvious from Mark's and his father's testimony regarding their lifestyle that obtaining and using drugs was their main preoccupation. However, the court was also free to infer that a habitual drug user, who admittedly used a number of different illegal substances, had access to more than one drug supplier. In contemporary society, and particularly in the criminal courts, knowledge of the lifestyle within the drug milieu is not beyond the common experience of the average fact finder. We therefore conclude that the trial court did not err in excluding Mark's proffered expert testimony on the issue of his alleged susceptibility to entrapment.

Mark next argues that he was not proven guilty beyond a reasonable doubt. It is his position that the State failed to rebut his affirmative defense of entrapment. We disagree.

■ To establish the affirmative defense of entrapment, the evidence must establish that the government, for the purpose of obtaining evidence, induced the defendant to commit a crime originated by the government and that the defendant was an innocent person who would not have committed the crime had he not been so induced. (*People v. Boalbey* (1986), 143 Ill. App. 3d 362, 364, 493 N.E.2d 369, 370-71; Ill. Rev. Stat. 1987, ch. 38, par. 7—12.) Once the defendant has presented some evidence in support of his contention that there was an entrapment, the State must prove beyond a reasonable doubt that defendant was not entrapped. (*People v. Chanath* (1989), 184 Ill. App. 3d 521, 524, 540 N.E.2d 468, 470.) More specifically, the defendant must demonstrate that the State induced him to commit a criminal act, and if the defendant does so, then the burden is on the State to prove the defendant was ready and willing to commit the crime without persuasion. *People v. Poulos* (1990), 196 Ill. App. 3d 653, 658, 554 N.E.2d 448, 451.

■ Here, the evidence in support of Mark's contention that he was entrapped was rebutted beyond a reasonable doubt by evidence

that he was predisposed to commit the criminal act. Mark testified that he was a habitual drug user who had exchanged cocaine for heroin with a police informant for the past five years. In addition, Agent Fowlar testified that Mark told him that he could deliver as much cocaine as Fowlar wanted, telephoned him to inquire about his satisfaction with the first delivery of cocaine, agreed to procure two additional ounces of cocaine, and consequently facilitated the delivery of 51 grams of cocaine. Mark was admittedly procuring, bartering and using cocaine and other illegal drugs long before the police informant requested that he obtain cocaine for Fowlar. Mark was clearly predisposed to commit the offense of delivery of a controlled substance. Based on this evidence, we conclude that Mark was proven guilty of delivery of a controlled substance beyond a reasonable doubt.

Finally, Mark argues that the State's involvement in his arrest constituted outrageous governmental conduct which violated his right to due process of law. We disagree.

A defendant's conviction may be reversed on appeal where it is evident that the nature and extent of police involvement was so over-reaching as to bar prosecution as a matter of due process of law. (*People ex rel. Difanis v. Boston* (1981), 92 Ill. App. 3d 962, 965-66, 416 N.E.2d 333, 336; *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373, 377.) In *Twigg*, the government agent proposed the creation of a factory to manufacture "speed," undertook the acquisition of the necessary equipment, raw materials, and a production site. In addition, the government agent was completely in charge of the laboratory. In that case, the court found that the governmental activities reached a demonstrable level of outrageousness and reversed the defendants' convictions.

In the present case, Mark contends that, over a five-year period, the police informant deliberately "hooked" him on heroin so that he could be "badgered" into purchasing cocaine for the agent and arrested for delivery of a controlled substance. Mark's contention is contradicted by the evidence adduced at trial. Mark had been a habitual drug user for six years before he met the police informant, and he had used, bartered and exchanged heroin with the informant for five years before his arrest for the offense charged in the present case. Further, in the present case, unlike in *Twigg*, Mark acquired the drug source and arranged for its delivery. Moreover, while the informant was present during the first meeting and drug sale, there was no evidence that he was in any way involved in or present during the final delivery of 51 grams of cocaine which led to Mark's arrest. In sum, the government's involvement in the events which led to Mark's ar-

rest and conviction did not rise to the level of outrageous conduct violative of his right to due process of law.

Accordingly, for all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CERDA,* P.J., and GREIMAN, J., concur.

---

*Justice White heard oral arguments in this appeal prior to his retirement. Since that time, Justice Cerda was designated the third member of the panel and he has read the briefs and listened to the tapes.