THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LANCE KING, Defendant-Appellant.

First District (5th Division) Nos. 1—88—0798, 1—89—2086 cons.

Opinion filed June 18, 1993.

Rita A. Fry, Public Defender, of Chicago (John T. Kennedy, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall E. Roberts, and Margaret J. Faustmann, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Defendant was convicted of aggravated criminal sexual assault and home invasion in a case involving complainant W.R. Eighteen months later, defendant was convicted of aggravated criminal sexual assault and home invasion in a case involving complainant D.M. Defendant appeals both convictions in this consolidated appeal contending that the admission of other crimes evidence, the assault of W.R. in the trial of D.M. and the assault of D.M. in the trial of W.R., deprived him of a fair trial in each instance. Defendant also argues that the trial court erred in admitting into evidence his confession to both assaults because such confession was involuntary. With respect to his second conviction, defendant claims that reversible error was present because the trial court failed to give the jury a written instruction that the defendant was presumed innocent and that the State had the burden of proving him guilty beyond a reasonable doubt. Finally, defendant appeals the sentence imposed by the trial court in the second trial, arguing that the trial court erred by sentencing him under the incorrect statute and abused its discretion in imposing a sentence of 30 years' imprisonment for his conviction of home invasion.

FACTS

Defendant was arrested pursuant to a warrant on August 26, 1986, for two aggravated criminal sexual assaults and home invasions which occurred on consecutive nights, both in the neighborhood in which defendant resided. Police officers came to his home at 7 a.m. and were told by defendant's mother that defendant had left for school. They proceeded to the bus stop one block from defendant's home and arrested him without advising his mother. At the time, defendant was 16 years old. At the station, oral and written statements were obtained in which defendant confessed to both assaults and home invasions. Prior to trial, defendant moved to suppress these oral and written statements.

SUPPRESSION HEARING

The following testimony was heard at the suppression hearing.

Detective Brian Meyers, the youth officer on duty at the time of defendant's arrest, testified that he arrested defendant on the morning of August 26, 1986, pursuant to a warrant. Meyers took him to the police station and advised him of his *Miranda* rights. Defendant

indicated that he understood his *Miranda* rights. Detective Meyers stated that he obtained an oral and then a written statement from the defendant. His immediate supervisor, Lt. Schoeneck, was present when defendant gave the written statement. Meyers testified that he and defendant had signed the written statement.

Meyers said that he was also present when defendant gave a second oral and written statement to Assistant State's Attorney John Murphy. At no time did he or anyone else promise defendant anything in return for these statements. Neither he nor anyone else present told defendant that he would be treated more harshly if he refused to give the statement. According to Meyers, defendant never asked to make a phone call.

On cross-examination, Meyers stated that he knew defendant was a juvenile when he made the arrest. Meyers explained that upon his arrival at the station, defendant was booked, fingerprinted, and advised of his *Miranda* rights and that defendant acknowledged that he understood each one of these rights individually. According to Meyers, defendant never indicated that he did not want to make a statement and never denied that he committed the crime.

Defendant testified that upon his arrival at the police station he was taken to a back room and handcuffed to a bench. At this time, Meyers asked him if he did "it" and he responded no. Defendant said that he was then advised of his rights. Defendant asked to make a call for which Meyers refused permission. He testified that he told the officers that he understood his rights and that he did not want to talk about the assaults, but wanted to call his mother. The detectives present did not respond, they just stared at him.

According to defendant, Meyers told him that if he did not sign the statement he would tell the judge and the State's Attorney and "all sorts of things could happen." He stated that he refused to sign Meyers' statement and that the only other paper he signed was one which said that he saw someone running away from a house that night.

On cross-examination, he denied that the signature and initials that appeared on Meyers' statement and the assistant State's Attorney's statement were his. He also denied that the assistant State's Attorney advised him of his rights. He testified that the assistant State's Attorney told him that things would go easier for him if he signed the second statement.

Detective Meyers was called by the State in rebuttal. He stated that after advising defendant of his rights, he told him that he could make a phone call if he wanted to, but defendant declined. He advised

defendant that there was no need for them to speak at that point. He told defendant that his investigation was complete and that he did not think that defendant had intended to hurt those two women. Defendant then broke down and confessed at which time he proceeded to give a detailed statement in answer to specific questions. Meyers typed up the statement in question and answer format and told defendant to carefully read it over to insure its accuracy. Meyers denied asking defendant to sign a blank piece of paper. Meyers examined the second written statement given by defendant and indicated that he saw defendant sign and initial it. He denied telling defendant that he could go home if he signed the statement.

On cross-examination, Meyers admitted that he knew defendant's mother was at home at the time of the arrest and that he did not contact her after defendant was arrested. He stated that he started typing defendant's statement at 8:30 a.m and that it was complete at 11:30 a.m.

Officer Cordell testified that he was with Meyers when they arrested defendant. He did not participate, but he was present when defendant was taken to Detective Meyers' office for questioning and corroborated Meyers' account of the subsequent events.

Lt. Russell Schoeneck testified that he was present during portions of the investigation, once for approximately a minute and once for approximately 15 minutes. He saw defendant read, initial and sign the typed statement three or four times. He never heard anyone threaten or promise anything to defendant in return for the statement.

Assistant State's Attorney John Murphy testified that he arrived at the police station at approximately 11:30 a.m. He told defendant that he was with the State and was not his attorney. He advised him of his *Miranda* rights, spoke with defendant, and then reduced defendant's statement to writing. Defendant read the statement out loud and then signed it. According to Murphy, defendant never asked to use a phone and was not threatened or promised anything in return for signing the statement.

The court denied defendant's motion to suppress, finding that defendant's statement was voluntary.

APPEAL No. 1—88—0798

Defendant was tried first for home invasion and the aggravated criminal sexual assault of W.R.

W.R. testified that on the evening of August 22, 1986, she was with her two young sons at home. She lived in a ground-floor apart-

ment in a multi-apartment structure. After putting the children to bed, she sat in the living room and watched television. Just prior to 10 p.m. she checked on the children, turned out the lights and went to bed. At the time, she was wearing a T-shirt and underwear. After she was in bed, she thought she heard a noise outside her bedroom window and looked out that window and then looked out her living room window. She did not see anything and returned to bed.

She said that thereafter she heard a noise from inside the apartment. Thinking it was one of her children, she rolled over and saw a man standing near her doorway. She described him as tall, thin and black. She laid still, hoping that he would think that she was asleep. The man approached the bed, threw the covers off of her, kneeled on the bed and placed a pillow over the back of her neck. He told her to shut up or he would hurt her children. She told him that there was money in her purse. Defendant stated that he was not interested in money and pulled off her underpants. She stated that she resisted and defendant pushed down on the pillow and again threatened her children.

W.R. testified that the assailant twice ordered her to "put it in," referring to the insertion of his penis in her vagina, but she refused. He then proceeded on his own to do so. Afterwards, the assailant pushed down on the pillow and she felt him get off the bed. After waiting a few minutes, she got out of bed, checked on the children and then called the police.

She said that at the hospital where she was taken following the assault, she described her attacker as a young black man, 18 or 19 years old, approximately 6 feet tall and wearing a blue shirt and red shorts. She testified that she only got a side view of her attacker. On a subsequent trip to the police station, she examined photographs but could not identify him. She did identify the shirt her attacker wore that night from among a dozen or so articles of clothing present. She testified that she never knew or saw defendant prior to that night.

On cross-examination, W.R. admitted that when the police arrived at her apartment following her assault she initially described her attacker as being 6 feet to 6 feet 2 inches tall and was unable to give a description of his clothing at that time. On redirect, she testified that after the assault when the police arrived, she was crying, nervous and very frightened.

Officer Thomas Healy testified that on August 22, 1986, he responded to a call that a rape had occurred in the vicinity of 193rd and Cottage Grove Avenue. At 192nd and Cottage Grove Avenue, Healy saw defendant walking with another young black male. At the time,

defendant was wearing a blue shirt and red shorts. Healy asked defendant if he had seen anything unusual. Defendant responded that he had seen a man wearing a hooded sweatshirt running towards a nearby forest preserve. Healy then departed, leaving Officer Charles Krane to continue the interview.

Officer Krane testified that after Healy left, defendant asked him why the police were looking for someone. After being told a rape was involved, defendant pointed northeast and asked if it was like the one which occurred on the previous night in the apartments over there (pointing).

The State called D.M. to testify about defendant's prior sexual assault upon her. Defendant objected. The court permitted the testimony with a limiting instruction, stating that "that testimony is not to be considered by you for the purposes of establishing guilt or innocence of the defendant. It will only go to some very limited issues with respect to which I will instruct you in detail, in writing, at the appropriate time."

D.M. then testified that on the night of August 21, 1986, she was at home in her apartment, in which she lived alone. During the course of the evening she took out her garbage, ate dinner and took a bath. After her bath, she put on a T-shirt and underwear and went into the living room to watch television where she fell asleep.

She woke up about 10 p.m. and went to bed, turning off her living room television and turning on the hallway light. She left the two lights in her living room china cabinet lit. She stated that she left these lights on because she lived alone and was afraid. She fell asleep at approximately 10:15 p.m. and awoke sometime thereafter, feeling someone lying on top of her. All the lights in her house that had been left on had been turned off. She stated that although there was some light coming in through the blinds, she could not see her attacker.

She said that the person on top of her was trying to pull her underwear off. He told her to take it off or he would blow her head off and that if she screamed he would kill her. He told her to "put it in" and she complied. Afterwards, he told her that if she called the police he would kill her.

D.M. stated that she saw that he was wearing a brightly colored T-shirt which had an insignia on it and a pair of shorts. She stated that she thought that he was young because his face was hairless and smooth. She described his hair as short and coarse and estimated that he weighed approximately 140 pounds. She said that he was tall and estimated his height at 5 feet 9 inches.

On cross-examination she testified that after the attack she went to her neighbor's house and called the police. Defense counsel asked her if she told them when they arrived whether a young man attacked her. She said no. On redirect she explained that when the police arrived at her apartment she was in shock and could not respond to their questions.

Detective Meyers testified that on August 21, 1986, he went to D.M.'s apartment and found her in a state of shock. He described her as crying and shaking and he stated that he was unable to have any type of conversation with her. He testified that he spoke to D.M. later that night at the hospital where she was taken following the assault. She was still upset and crying, but she was able to give him a detailed statement about the assault.

Meyers went on to testify about the aggravated criminal sexual assault of W.R. on the following night. He said that on August 22, 1986, he was assigned to investigate the assault on W.R. He arrived at her apartment and found her on the verge of hysteria; he was unable to interview her at the time. She was subsequently transported to a hospital where she gave him a statement about what occurred on that night.

He then went to her apartment and retrieved from a window fingerprints which were later identified as defendant's. Meyers then related the circumstances of defendant's arrest, trip to the station, booking, subsequent oral confession and giving of a written statement. His testimony was the same as that given at the suppression hearing. Meyers then read defendant's statement to the jury in which defendant admitted to entering the homes of W.R. and D.M., threatening them and having sex with them.

Jennie Hahn, a forensic scientist specializing in serology, testified that based on tests conducted from samples taken from W.R. and the defendant's blood and saliva, the semen present could have originated from defendant.

Lauren Wicevic, a latent print examiner, testified that she compared a print retrieved from W.R.'s window with those on defendant's fingerprint card and concluded that they matched.

Defendant's mother testified that officers came to her home on August 26, 1986, shortly after 7:10 a.m. and asked to speak to defendant concerning a man he saw running from the scene of a crime a few days earlier. She told them he had left for school and would be back at 2:30 p.m. She stated she was not told he was arrested until 5:10 p.m.

Defendant's brother testified that he was with the defendant and a friend at home on the night of the assault. From the balcony they saw a man running into the forest preserve and then saw policemen in the area. He and defendant then went over to see what was happening when they were stopped and questioned by Officer Healy.

During closing arguments, the prosecutor stated that D.M. lived alone, like W.R., and had left the lights on because she was afraid. He told the jury, "You saw [W.R.] break down. You saw D.M. come out and break down."

The jury found defendant guilty of home invasion and aggravated criminal sexual assault. He was sentenced to 15 years' imprisonment.

APPEAL No. 1—89—2086

Defendant was subsequently tried for the aggravated criminal sexual assault and home invasion involving D.M.

Officer Lee Cordell testified that on the night of August 21, 1986, he responded to a rape call. Upon arriving at D.M.'s apartment, he found her standing at the door with a knife in her hand. He attempted to interview her, but he was unable to do so because she was crying, trembling and could not speak. He observed that the glass sliding patio door of the apartment was locked, but the bar securing it was loose. Officer Cordell subsequently related the circumstances of defendant's arrest, booking, and initial questioning at the police station. This testimony was the same as that given at the suppression hearing.

D.M. then testified. Her testimony at this trial was substantially the same as that given at defendant's earlier trial for the rape of W.R. She added that after her assailant left through the front door, she noticed that her patio door was partially open. She added further that when the police arrived she gave them the knife, but she does not remember speaking to them. She remembers speaking to Meyers in the hospital where she was able to give a description of her attacker although she was still crying.

Officers Krane and Healy testified for the State, giving the same testimony as they had at defendant's first trial. Detective Meyers testified to the circumstances of defendant's arrest, booking, oral confession and subsequent written statement as he had at defendant's first trial. As in the first trial, Meyers read defendant's confession to the jury in which defendant admitted to raping both W.R. and D.M.

Meyers testified that at the time of the defendant's arrest he was a youth officer and in charge of the investigations of the assaults on D.M. and W.R. Meyers related his observations of the crime scene in-

volving W.R. and his retrieval of defendant's print from that window. Over defense counsel's objection, Meyers then testified that he compared the aggravated criminal sexual assault of D.M. with the aggravated criminal sexual assault of W.R. which occurred the night after D.M.'s assault. He stated "that both crimes scenes were located within two blocks of each other, they were both apartments, they were both first-floor apartments, that attacks occurred on [young] women living by themselves *** or with small children. That the attacks took place while the women were in their beds asleep somewhere around 11:00 o'clock at night. *** That the description[s] of both victims were basically the same."

Over defense counsel's objection, Meyers testified that these similarities led him to develop an offender profile through a procedure utilized by the FBI. He said that he looked at past sex offenders living in proximity of the crime who used the same type or method of attack. As the result of this investigation, he obtained defendant's fingerprint card from a prior disorderly conduct charge and sent it to the crime lab along with the print he recovered from W.R.'s window. He received confirmation that the prints matched and then obtained an arrest warrant for defendant. On redirect, Meyers testified over objection that defendant's prior disorderly conduct arrest was for peering in through someone's window. The trial court found that this charge was admissible in establishing *modus operandi*.

Assistant State's Attorney John Murphy testified. His testimony was the same as that he gave at the suppression hearing. Murphy read to the jury the defendant's second written statement which was given in his presence. In this statement, defendant admitted that he saw D.M. in her apartment through one of her windows in the beginning of August 1986 as he was walking by her apartment. Defendant also admitted he peered into W.R.'s window and saw her prior to entering her apartment and assaulting her.

Defendant did not proffer and the trial court did not give Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981) (hereinafter IPI Criminal 2d), which provides that the defendant is presumed innocent and must be proven guilty beyond a reasonable doubt. The jury subsequently found defendant guilty of aggravated criminal sexual assault and home invasion. Defendant was sentenced to 50 years' imprisonment on the aggravated criminal sexual assault charge and 30 years' imprisonment on the home invasion charge. Defendant now appeals both convictions.

OPINION

On appeal, defendant contends that the trial court erred in admitting into evidence his confession to both rapes because it was involuntary. Defendant also argues that the admission of other crimes evidence in both trials deprived him of a fair trial and that the confession, if otherwise voluntary, should have been redacted so as to delete that portion confessing to the rape not at issue in the case being tried. With respect to the appeal of his second conviction (appeal No. 1—89—2086), defendant argues that reversible error was present because the trial court failed to give the jury a written instruction that the defendant was presumed innocent and that the State had the burden of proving him guilty beyond a reasonable doubt. Finally, defendant appeals the sentence imposed by the trial court in the second trial, arguing that the trial court improperly imposed an extended-term sentence upon him for the aggravated criminal sexual assault charge and abused its discretion in sentencing him to 30 years' imprisonment for home invasion.

DEFENDANT'S CONFESSION

We will first address defendant's argument that his confession was involuntary and therefore improperly admitted in both trials. The test in determining the voluntariness of a confession is whether, "under the totality of the circumstances, the statement was made freely, without compulsion or inducement of any sort [citation], with consideration given to the characteristics of the accused and the details of the interrogation." (*People v. R.B.* (1992), 232 Ill. App. 3d 583, 592-93, 597 N.E.2d 879.) The relevant considerations include, but are not limited to, "the existence of any threats, promises, or physical coercions; the length and intensity of the interrogation; and the age, intelligence, experience and physical condition of the defendant." (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401, 495 N.E.2d 984.) Although confessions of juveniles are generally subjected to the same standard as confessions made by adults (*People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910), courts are cognizant of the fact that "the potential for coercion is enhanced" in such a situation (*People v. Brown* (1992), 235 Ill. App. 3d 479, 490, 601 N.E.2d 1190), and consequently will take the "utmost care *** to insure that the confession is voluntary and not coerced, suggested or the result of the juvenile's ignorance of his rights or his adolescent fantasy, fright or despair" when such confession is given in the absence of the juvenile's

counsel as was the case here. *In re J.S.* (1984), 121 Ill. App. 3d 927, 936, 460 N.E.2d 412.

It is in the province of the trial judge, in deciding whether a statement was coerced, to resolve any conflicts in the evidence and determine the credibility of the witnesses. (*People v. Bobe* (1992), 227 Ill. App. 3d 681, 592 N.E.2d 301.) A reviewing court will not disturb the ruling of a trial court on the voluntariness of a confession decided at a motion to suppress unless such decision is against the manifest weight of the evidence. *People v. R.B.*, 232 Ill. App. 3d at 589.

In support of his contention that his confession was involuntary, defendant points to the following: that the police never notified his mother of his arrest in spite of the fact that they spoke to her immediately before his arrest; that section 3—2(1) of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2) required them to make a reasonable attempt to notify the parents of a juvenile who had been arrested pursuant to a warrant; that he was prohibited from consulting with an adult interested in his welfare during his interrogation in that he was not brought before a youth officer and was prohibited from calling his mother; that he was held for five hours and briefly handcuffed to a bench at the police station; and that the officers promised that everything "would go alright" if he signed the written statement.

■ We note at the outset that there was conflicting testimony as to whether defendant was prohibited from contacting his mother, how long he was questioned prior to giving his statement and what the officers and assistant State's Attorney said prior to defendant's signing the written statements. The resolution of these conflicts in the testimony is squarely within the trial court's purview as the fact finder, and we will defer to its judgment with respect to those issues. *People v. Bobe*, 227 Ill. App. 3d at 704-05.

■ Defendant's contention that the police did not notify his mother prior to or after his arrest is uncontradicted, as Detective Meyers admitted that he did not contact her. However, we find this factor in and of itself to be insufficient to vitiate the confession. While we do not condone the actions of the police in this respect, the failure to comply with section 3—2(1) of the Juvenile Act is only one factor to be considered in determining the voluntariness of a confession. (*People v. Stachelek*, 145 Ill. App. 3d at 401-02; see *People v. J.S.*, 121 Ill. App. 3d at 936 ("where a juvenile has been admonished in detail with respect to his right to remain silent *** and he has understood such a warning, a police officer's failure to comply with section 3—2 does not preclude admission of defendant's statement").) On point is this

court's decision in *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984. In *Stachelek*, the 15-year-old defendant was arrested shortly after 6 a.m., taken to the police station at 7 a.m. and waited in an interview room until 8:30 a.m. when a youth officer arrived. After receiving his *Miranda* warnings, defendant gave an oral statement. He made subsequent statements at 3:30 p.m. and 4:30 p.m. At no time were his parents notified. This court rejected defendant's contention that his afternoon statements were inadmissible, stating that section 3—2 of the Juvenile Act "is not meant to immunize minors from police investigation and interrogation," and found that the confession was admissible because the record revealed no coercion. *People v. Stachelek*, 145 Ill. App. 3d at 402; see also *People v. Bobe*, 227 Ill. App. 3d at 703 (confession properly admitted, "although the defendant's father was prevented from seeing him, the trial judge found that the defendant had been advised of his rights and that he understood those rights").

We recognize that this court has held that a juvenile should be allowed to consult with an adult interested in his welfare, either a parent or a youth officer, or his confession may be rendered inadmissible. (*People v. R.B.*, 232 Ill. App. 3d 583, 597 N.E.2d 879; *People v. Knox*, 186 Ill. App. 3d 808, 542 N.E.2d 910.) In this case, although defendant did not talk to his mother, he did speak with Meyers, who was the youth officer on duty at the time of defendant's arrest. Meyers stated that he asked defendant if he wanted to make a phone call and specifically informed defendant that he did not have to talk to the police if he did not want to, thus minimizing the otherwise potentially coercive environment. Moreover, even if a youth officer were not present, that would not automatically compel a finding, in and of itself, that the confession was involuntary; the test is still one of the totality of the circumstances. See *People v. Brown*, 235 Ill. App. 3d at 492-93 ("even though it is undisputed that no youth officer was summoned until 6:30 p.m., when defendant had been at Area 1 for over five hours and interrogated briefly, this violation of the Act alone will not warrant suppression of the statement").

There is ample affirmative evidence to support the trial court's finding that the confession was voluntary. First, according to the testimony of the officers, defendant confessed shortly after he was initially questioned and his statement was reduced to writing immediately thereafter. (See *In re Potts* (1978), 58 Ill. App. 3d 550, 374 N.E.2d 891 (confession held voluntary when 12-year-old defendant was questioned for approximately four hours before giving statement when police testified that they did not raise their voices at respondent

or threaten him in any way and there was no indication in the record that they had denied defendant food or use of the washroom).) Also, defendant initialed and signed two separate statements given to two separate individuals. He did so after he received his *Miranda* rights from three different individuals and admittedly acknowledged that he understood these rights. (*People v. Bobe*, 227 Ill. App. 3d at 704; *People v. J.S.*, 121 Ill. App. 3d at 936-37.) All four of the State's witnesses at the suppression hearing said that they did nothing to coerce the defendant to confess and they further testified as to defendant's expressed desire and state of mind to make a full and complete disclosure of what he had done. Consequently, we think the trial court correctly admitted defendant's confession at both trials.

APPEAL No. 1—88—0798

Defendant next contends that the admission of evidence concerning his sexual assault of D.M. in his trial for the attack on W.R. deprived him of a fair trial. In particular, defendant claims that the trial court erred in allowing the testimony of D.M., the testimony of Meyers that defendant admitted to the assault of D.M., and the portion of defendant's written confession to that other assault. We disagree.

Evidence of other crimes may not be admitted to show defendant's character or his propensity to commit crimes. This evidence, however, can be admitted for a number of relevant purposes (see *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292), including proof of defendant's *modus operandi* to establish identity (*People v. Reppa* (1982), 104 Ill. App. 3d 1123, 433 N.E.2d 1091), and common design or scheme. Generally:

> "[w]here evidence of prior bad acts is offered to prove *modus operandi* or that the crime charged was part of a common design or plan, there must be a high degree of identity between the facts of the crime charged and the other offense in which the defendant was involved. The two offenses must share such distinctive common features as to earmark both acts as the handiwork of the same person." (*People v. Illgen* (1991), 145 Ill. 2d 353, 372-73, 583 N.E.2d 515.)

The admission of evidence is within the discretion of the trial court and its rulings will not be disturbed absent a showing of abuse of that discretion. *People v. Smith* (1991), 222 Ill. App. 3d 473, 584 N.E.2d 211.

In this case, there is a sufficient similarity between the two offenses to warrant the use of defendant's assault of D.M. in the trial

of W.R. First, in both cases, there were similarities in the sexual assaults themselves. Defendant made similar verbal threats prior to both rapes. He did not brandish a weapon in either case. Defendant attempted to rip off both of the victims' underpants without first asking them to disrobe. In each case, defendant specifically told the victims to "put it in." After each rape, defendant immediately left the apartment. See *People v. Hall* (1992), 235 Ill. App. 3d 418, 434, 601 N.E.2d 883 (other crimes evidence properly admitted where all the victims were young black males from distressed homes who lived at defendant's foster home, victims were all asked to stay home alone with defendant while the other boys went out, the incidents took place in defendant's bedroom, defendant performed similar sexual acts with victims, and defendant told each victim "You did good" after the sexual encounter).

Second, the assailant's method of entry and approach of the victims were similar. In each case, defendant observed the victim through her window prior to the assault. Defendant broke into the ground-floor apartment of each victim directly from outside the building rather than through an interior corridor, entering W.R.'s through a patio door and D.M.'s residence through a window. In each case, the assailant waited until the victim appeared to be asleep in her bed and then approached the victim in the dark. (See *People v. Lewis* (1983), 115 Ill. App. 3d 389, 450 N.E.2d 886, *rev'd on other grounds* (1984), 103 Ill. 2d 111, 468 N.E.2d 1222 (other crimes evidence properly admitted where both attacks occurred on same block, both occurred within a two-month time frame, both occurred while the victims were sleeping and their husbands were at work, attacker threatened harm, attacker attempted to conceal his identity to some extent, both were similar sexual attacks, both apartments were ransacked and small items stolen); accord *People v. Smith* (1992), 236 Ill. App. 3d 1060, 602 N.E.2d 1388.) Moreover, in each case the assailant was wearing a T-shirt and shorts during the attack.

Third, the victims were similar. Each victim was in her mid-twenties and the record reflects that they were both petite. Both lived in the ground-floor apartment of a multi-unit building. Neither lived with another adult. Furthermore, on the nights of the attacks, both victims were wearing similar clothing, a T-shirt and panties, and had spent time in their respective living rooms watching television prior to retiring. See *People v. Jendras* (1991), 216 Ill. App. 3d 149, 576 N.E.2d 229 (other crimes evidence sufficiently similar to constitute evidence of *modus operandi* when all three victims were seventh- or eighth-grade males who had defendant as a teacher, all victims went to his

apartment alone where they were invited to swim and use the sauna, all victims were living with their mothers after their parents had separated, and the acts of fondling were similar and stopped when the victims stated that they had to leave).

Additionally, we note that both victims were assaulted at approximately 11 p.m. The victims each lived about one block from defendant's residence. They were assaulted within 24 hours of each other; W.R was assaulted on August 22, 1986; and D.M. was assaulted on August 21, 1986. See *People v. Tipton* (1990), 207 Ill. App. 3d 688, 566 N.E.2d 352 (other crimes evidence properly admitted when both victims were approached on the same evening, in the same vicinity, by a black male wielding a meat clever).

Defendant contends that these similarities are insufficient to warrant the admission of this evidence, pointing to several differences between the two incidents, including the race of the victims, the particular threats employed, and the specific point of entry into the victims' homes. It is well established, however, that for evidence of other crimes to be admissible for the purposes of establishing *modus operandi*, the other crimes need not be completely identical (*People v. Hall*, 235 Ill. App. 3d at 433) because "[c]ertainly some dissimilarity will always exist between independent offenses." (*People v. Illgen*, 145 Ill. 2d at 373; *People v. Smith*, 236 Ill. App. 3d at 1063 (the "test cannot be one of exact, rigorous identity, for some dissimilarity will always exist between independent crimes").) In this case, we cannot say that these differences are such as to call into question the admissibility of the other crimes evidence. (See *People v. Smith*, 236 Ill. App. 3d at 1064; *People v. Tipton*, 207 Ill. App. 3d at 695; *People v. Hall* (1989), 186 Ill. App. 3d 123, 541 N.E.2d 1369.) These differences go to the weight given the evidence, not its admissibility. See *People v. Tipton*, 207 Ill. App. 3d at 695.

In the context of this issue, defendant also claims error because his confession to both sexual assaults was admitted without alteration at his trial for the attack on W.R. While evidence of other crimes contained in a confession generally must be redacted prior to its admission into evidence (*People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234), this was unnecessary in this case as the other crimes evidence contained in that confession was independently admissible to show *modus operandi*. As such, no error occurred. See *State v. Joseph* (La. Ct. App. 1984), 454 So. 2d 237 (trial court properly allowed introduction of entire confession without deleting reference to other armed robbery when the defendant's statement showed

that he used the same tactics as he used in the charged offense, thus showing his *modus operandi*).

■ The defendant claims that the detail in which the other assault was elicited was excessive and served only to inflame the jury. Citing *People v. Diaz* (1979), 78 Ill. App. 3d 277, 397 N.E.2d 148, defendant asserts that the trial court erred in allowing testimony as to D.M.'s post-assault condition where defendant was on trial for the attack on W.R. We initially note that defense counsel failed to object at trial and, in fact, affirmatively acquiesced to this testimony, which is now alleged as error. As such this issue has been waived for purposes of appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Even if defendant had not waived this issue, his claim is unavailing, as *Diaz* is inapposite from the case *sub judice*. In *Diaz*, the prosecution solicited the fact that the "other crimes" victim in *Diaz* was seven months pregnant and that Diaz had threatened to shoot her in the stomach and shoot another woman's baby. In contrast, the statements defendant complains of here, that D.M. was in shock and could not answer questions after the rape, were elicited only after defense counsel specifically opened the door by asking D.M. what she said to the police when they arrived on the scene immediately following the assault. Thus, no error occurred since she should be permitted to explain why she did not tell the police about the assault in detail when they first arrived. *People v. Chitwood* (1986), 148 Ill. App. 3d 730, 499 N.E.2d 992.

■ We further note that even if the evidence of the other crimes would not have been admissible, such error would have been harmless in the face of the overwhelming evidence presented at trial. Defendant confessed to the home invasion and rape of W.R. in two separate statements. His fingerprints were found on the window of W.R.'s apartment. He spoke with two police officers in the immediate vicinity of the crime right after the rape occurred and was described by one of the officers as wearing a T-shirt and shorts. The tests performed on the sperm taken from W.R. indicated that defendant could have been the assailant. Moreover, although W.R. could not identify her attacker's face, she was able to identify defendant's shirt from among a dozen items of clothing as the one worn the night she was assaulted and also was able to give a general physical description of her assailant which defendant matched. In light of this overwhelming evidence, even if error were present, the admission of the assault of D.M. was harmless. See *People v. Gray* (1991), 215 Ill. App. 3d 1039, 576 N.E.2d 177 (admission of other crimes evidence held harmless); *People*

*v. Allen* (1989), 184 Ill. App. 3d 438, 540 N.E.2d 411; see also *People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254.

The final issue raised by defendant with respect to this appeal concerns remarks made during the State's closing arguments in which the prosecutor commented that D.M. broke down while on the stand and reiterated D.M.'s testimony that she left the lights on because she lived alone and was afraid.

Generally, remarks made during the prosecution's closing argument are not grounds for reversal. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) The propriety of these remarks are at the discretion of the trial court. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329.) The test for determining whether the remarks constitute reversible error is "whether the remarks, considered in light of all the evidence, were a material factor in the conviction, or whether the jury might have reached a different result had the comments not been made." *People v. McCall* (1989), 190 Ill. App. 3d 483, 493, 546 N.E.2d 62.

■ Initially, we note that defendant failed to object at trial to these remarks, thus waiving this issue for purposes of review. (*People v. Enoch*, 122 Ill. 2d at 186.) Furthermore, even if the merits of defendant's claim were reached, we would conclude that these two remarks would not require reversal. While the remarks may have been erroneous, particularly the reiteration of the fact that D.M. was crying while on the witness stand, we find that the admission of this evidence was harmless in light of the overwhelming evidence present. See *People v. Hairston* (1973), 10 Ill. App. 3d 678, 686, 294 N.E.2d 748 ("weeping of the deceased's mother *** did not result in reversible prejudice to defendant").

Consequently, for the foregoing reasons, defendant's conviction for the aggravated criminal sexual assault and home invasion involving W.R. are affirmed.

APPEAL No. 1—89—2086

On appeal from his conviction for the sexual assault of D.M., defendant similarly contends that he was deprived of a fair trial because the trial court erred in admitting evidence of other crimes. In the trial for the home invasion and aggravated criminal sexual assault of D.M., two instances of other crimes were admitted into evidence, the rape of W.R. and defendant's prior arrest on a disorderly conduct charge for peering in the window of a residence not involved in either of these cases. Defendant's "peeping Tom" charge was not introduced at defendant's earlier trial. As we have previously discussed, the two

sexual assaults are sufficiently similar to allow admission of the assault of W.R. to show defendant's *modus operandi* and, thus, no error occurred in its admission. However, we agree with defendant that the admission of the "peeping Tom" charge constituted error.

The State attempts to justify the admission of the "peeping Tom" charge by arguing that the incident was indicative of a common scheme or design. Specifically, the State contends that this charge is admissible because defendant's confession established that he watched both D.M. and W.R. through their windows before breaking into their apartments. Furthermore, the State notes that defendant's confession provides that earlier that month, he watched D.M. in her apartment.

Evidence of other crimes may be properly admitted to establish a common scheme or design. (*People v. Kimbrough*, 138 Ill. App. 3d at 485.) The concept of common scheme or design is distinct from that of *modus operandi* in that a common scheme or design "refers to a larger criminal scheme of which the crime charged is only a portion" (*People v. Tipton*, 207 Ill. App. 3d at 696), whereas *modus operandi* refers to "a pattern of criminal behavior so distinct that separate crimes or wrongful conduct are recognized as the work of the same person." *People v. Kimbrough*, 138 Ill. App. 3d at 486.

In this case, the "peeping Tom" charge is inadmissible as either part of a common scheme or *modus operandi*. This charge composes only one aspect of the criminal conduct at issue in this case and was for conduct unrelated to either W.R. and D.M. The admission of this charge served only to demonstrate defendant's propensity to commit aggravated criminal sexual assault and thus constituted error. *People v. Rose* (1990), 198 Ill. App. 3d 1, 555 N.E.2d 414; see also *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667 (rejecting State's claim that other sexual assaults were admissible to show a common design, finding that testimony served no proper purpose).

■ Although the admission of defendant's prior arrest on a "peeping Tom" charge constituted error, it was harmless. The evidence of defendant's guilt with respect to his assault upon D.M., while not as fully textured as the evidence presented in the earlier trial with respect to the assault of W.R., is still overwhelming. Defendant gave two full and detailed confessions to the home invasion and aggravated criminal sexual assault at issue in this case. In his confession, defendant described how he entered the victim's apartment, what he said to her, how he assaulted her, and how he left the apartment. (See *People v. Lee* (1987), 164 Ill. App. 3d 155, 517 N.E.2d 628 (finding that admission of defendant's confession provided overwhelming evidence of her guilt).) This confession was substantially corrobo-

rated in the detailed testimony of D.M. and the police officers. (See *People v. Bass* (1991), 220 Ill. App. 3d 230, 580 N.E.2d 1274.) Moreover, the proper admission into evidence of defendant's aggravated criminal sexual assault of W.R. in this case provides further evidence of defendant's identity by establishing his *modus operandi*.

In determining that the erroneous admission of this evidence was harmless, we also note that there was no extended emphasis upon the previous "peeping Tom" incident, as the jury was only told once that defendant was arrested on a "peeping Tom" charge and the prosecutor remarked once during closing arguments that defendant had a history of looking into windows. (See *People v. Richardson* (1988), 123 Ill. 2d 322, 343-44, 528 N.E.2d 612.) Moreover, it is difficult to see how much additional prejudice defendant suffered from the disclosure that he had a prior "peeping Tom" charge when evidence of another sexual assault and home invasion substantially similar to the one he was on trial for was properly admitted at trial, particularly when that second assault occurred within a block of defendant's home and on the night after the first assault. (*People v. Bailey* (1980), 88 Ill. App. 3d 416, 410 N.E.2d 545 (other crimes evidence erroneously admitted deemed harmless where other evidence contained all the elements necessary to find defendant guilty of the crime charged).) Consequently, we find the error resulting from the admission of this testimony harmless.

Defendant next argues that the trial court erred in allowing Detective Meyers' testimony concerning his investigation of the sexual assaults. As previously discussed, Meyers testified that as the result of his examination of the crime scene and the description of the attacker, he developed a profile of potential suspects by using an FBI procedure which looked at past sex offenders living in the same area with the same method of operation and as a result obtained defendant's fingerprint card. Defendant contends that the error in admitting this "scientific evidence" was compounded by a remark made during closing arguments where the prosecutor stated that as the result of this profile "they honed in on a local individual who had a history of looking in windows, and he told you in his statement that's how he chose his victims."

■ We agree with defendant that Officer Meyers' testimony regarding his construction of a "sex offender profile" and defendant's match with that profile was improperly admitted. (See *People v. Brown* (1992), 232 Ill. App. 3d 885, 598 N.E.2d 948 (testimony of complete profile of drug dealer which corresponded to the circumstances surrounding defendant's arrest was error).) Although admit-

ted during the course of Meyers' description of how he came to arrest defendant, the presentation of that profile and defendant's match to it were put forth as a product of a scientific process. In this case, there was no showing that the admission of this "scientific" testimony was necessary to assist the jury in making its determination as to whether defendant was guilty of the rape in question. (See *People v. Brown*, 232 Ill. App. 3d at 898-99 (rejecting profile testimony of a drug dealer and declining to adopt the position that the average juror is incapable of making a distinction between a drug dealer and a drug user without the assistance of an expert); *People v. Masor* (1991), 218 Ill. App. 3d 884, 578 N.E.2d 1176.) Therefore, this testimony comprised an opinion on the ultimate issue of fact before the jury, whether defendant actually committed the assault, which was within the common understanding of the jury. (*People v. Elder* (1991), 219 Ill. App. 3d 223, 579 N.E.2d 420.) The admission of this testimony here only served to imply that defendant had a propensity to commit sex offenses and was thus improper. *People v. Bradley* (1988), 172 Ill. App. 3d 545, 526 N.E.2d 916 (error to admit testimony on the characteristics of child abusers, particularly where the State did not link defendant to the profile it offered, thus improperly allowing the jury to speculate how defendant fit the profile in question).

Furthermore, even if a proper foundation for Meyers' testimony was otherwise laid, the "sex offender" profile in question does not appear to be sufficiently reliable to attain the necessary scientific acceptance essential as a foundation for the admission of scientific testimony. (See *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070 (error to admit polygraph evidence because it was not sufficiently reliable); *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733.) We conclude, however, that in light of the overwhelming evidence in the case, the error in admitting this evidence was harmless.

Defendant's next contention in this appeal is that the trial court's failure to properly instruct the jury constituted reversible error. Specifically, defendant complains of the trial court's failure to give the IPI Criminal 2d No. 2.03. This instruction provides:

> "The defendant is presumed to be innocent of the charge[s] against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the

State throughout the case. The defendant is not required to prove his innocence." Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981).

Defendant concedes that he did not tender this instruction and argues that the trial court's failure to give this instruction *sua sponte* constitutes reversible error. We disagree.

In *People v. Layhew* (1990), 139 Ill. 2d 476, 564 N.E.2d 1232, the Illinois Supreme Court recognized the importance of a written instruction informing the jury of the presumption of defendant's innocence and the State's burden of proof "is a time-honored and effective method of protecting a defendant's right to a fair trial." (139 Ill. 2d at 486.) The court held that while the failure to give IPI Criminal 2d No. 2.03 was error, such error "does not automatically result in a finding that defendant's constitutionally protected right to a fair trial has been violated." (*People v. Layhew*, 139 Ill. 2d at 486.) The *Layhew* court stated that in determining whether reversible error was present, "a reviewing court must look to all the circumstances to determine whether defendant received a fair trial, 'including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors.' " 139 Ill. 2d at 486, quoting *Kentucky v. Whorton* (1979), 441 U.S. 786, 789, 60 L. Ed. 2d 640, 643, 99 S. Ct. 2088, 2090.

The factors which the *Layhew* court looked at to avert reversal are present in this case as well. First, the trial judge in this case read a charge to all potential jurors prior to the actual commencement of the *voir dire* which was substantially the same as the one in *Layhew*. (139 Ill. 2d at 479-80.) The court here said to all prospective jurors that it was going to tell them about "some broad, fundamental principles of law that apply to all criminal cases." The trial judge then told the jury that

"information, no matter how many counts it may contain, is not to be considered by you as any evidence or proof against the defendant, nor does the law allow you to infer any presumption of guilt against the defendant simply because the information has been filed. In other words, the expression 'Where there's smoke there's fire,' has absolutely no place in the law. Under our law a defendant is presumed to be innocent of the charges placed against him in the information, and this presumption of innocence remains with the defendant throughout every stage of the trial and during your deliberations on a verdict, and must be kept in your mind at all times during the presentation of evidence and during your deliberations on a

verdict. This presumption of innocence is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty. The defendant is not required to prove his innocence, nor is he required to testify or present any evidence whatever in his own behalf. The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and that burden remains on the State throughout every stage of the trial and during your deliberations on a verdict."

The trial judge concluded his charge to the array, telling all potential jurors that, "[i]f you become convinced beyond a reasonable doubt, from all the evidence in the case, that the defendant is guilty as charged, it is your duty to find him guilty. If, after hearing all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty as charged, it is your duty to find him not guilty." This statement is substantially the same as the one given by the trial court in *Layhew* which our supreme court found relevant in its determination that reversible error was not present. *Layhew*, 139 Ill. 2d at 479-80; see also *People v. Ayala* (1986), 142 Ill. App. 3d 93, 97, 491 N.E.2d 154 (considering that trial court "outlined and explained the fundamental principles of presumption of innocence and reasonable doubt" prior to the *voir dire* as a factor in determining that reversible error was not present when trial court failed to give the jury IPI Criminal 2d No. 2.03).

Furthermore, like the jurors in *Layhew*, each juror in this case was asked during *voir dire* as part of a panel of four whether he or she understood that the defendant is presumed innocent and must be proven guilty beyond a reasonable doubt. (139 Ill. 2d at 480.) As in *Layhew*, each juror individually answered that he or she understood. See also *People v. Ayala*, 142 Ill. App. 3d at 97 (noting fact that each juror was questioned on State's burden of proof and its responsibilities with respect to that burden).

The opening and closing arguments of the prosecution and the defense are also relevant in determining whether the failure to give this instruction constitutes reversible error. (*People v. Ayala*, 142 Ill. App. 3d at 97.) Here, the prosecutor in his opening statement told the jury that the State needed to prove defendant guilty beyond a reasonable doubt. Defense counsel also mentioned this burden to the jury three times in his opening statement.

While the prosecutor only mentioned the reasonable doubt standard once in his closing argument, defense counsel repeatedly emphasized the reasonable doubt standard, reminding that jury that this was

the applicable standard no less than 25 times. Moreover, although defense counsel did not stress that defendant was presumed innocent, he did state twice that the defendant bore no burden to prove his innocence. *People v. Ayala*, 142 Ill. App. 3d at 97; see also *People v. Currie* (1980), 84 Ill. App. 3d 1056, 405 N.E.2d 1142 (considering closing argument of defense counsel in which defense counsel told the jury the applicable burden of proof in determining whether reversible error existed was in jury instructions).

The potential impact resulting from the trial court's failure to give IPI Criminal 2d No. 2.03 to the jury was further mitigated by the other instructions the trial court gave the jury in writing. Like the trial court in *Layhew*, the jury was given the following collateral instructions: IPI Criminal 2d No. 1.01, which admonished the jury that it must follow all the instructions and not single any out; IPI Criminal 2d No. 1.03, which provides that neither opening nor closing statement is evidence; and IPI Criminal 2d No. 2.02, which provides that the information is just the charging instrument and did not constitute evidence against the defendant nor did it create an inference of guilt. *Layhew*, 139 Ill. 2d at 484-85.

Moreover, the jury was expressly informed in other written instructions given by the court that the defendant must be proved guilty beyond a reasonable doubt. Both the home invasion instruction, IPI Criminal 2d No. 11.22, and the aggravated criminal sexual assault instruction, IPI Criminal 2d No. 11.34 (1987 Supp.), provided that "[t]o sustain the charge * * *, the State must prove the following propositions." After then listing the elements of the offense, each instruction then provided:

> "If you find from your consideration of all the evidence that each one of these propositions has been proven beyond a reasonable doubt, you should find the Defendant guilty.
>
> If you find from your considerations of all the evidence that any one of these propositions has not been proven guilty beyond a reasonable doubt, you should find the Defendant not guilty."

(*Cf. People v. Cesarz* (1969), 44 Ill. 2d 180, 190, 255 N.E.2d 1 (holding that trial court's failure to give second paragraph of IPI Criminal 2d No. 2.03 was not reversible error where the basic tenet that the defendant is presumed innocent and that can only be overcome by proof beyond a reasonable doubt was contained in the first paragraph of that instruction which was given).) Thus, the jury was informed in the instructions of the specific offenses for which defendant was con-

victed that defendant needed to be proven guilty beyond a reasonable doubt.

As we previously noted, the evidence against defendant here is overwhelming, although such a determination is not a necessary prerequisite to finding that no reversible error was present. (*People v. Layhew*, 139 Ill. 2d at 490-91 (finding that young victim's testimony in sexual assault prosecution was competent "and that itself is sufficient to withstand an attack, for the jury was entitled to believe whom it chose" in the context of whether a defendant's conviction should be reversed when the trial court failed to tender IPI Criminal 2d No. 2.03).) As such, considering the totality of the circumstances, we determine the jury was adequately informed on the State's burden of proof and defendant's presumption of innocence and that the result of the trial would not have been different if the instruction had been given. *People v. Layhew*, 139 Ill. 2d at 492; *People v. Ayala*, 142 Ill. App. 3d at 97.

In so deciding, we note the United States Supreme Court's recent decision in *Sullivan v. Louisiana* (1993), 508 U.S. ___, 124 L. Ed. 2d 182, 113 S. Ct. 2078. In *Sullivan*, the Court determined that a harmless error analysis could not be applied in the situation where the trial court erred and gave an instruction which misdefined the reasonable doubt standard. The instruction at issue in *Sullivan* was "essentially identical" to the one the Court held unconstitutional in *Cage v. Louisiana* (1990), 498 U.S. 39, 112 L. Ed. 2d 339, 111 S. Ct. 328. The *Cage* instruction attempted to define "reasonable doubt" and provided in part:

> "This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*." (Emphasis in original.) *Cage v. Louisiana*, 498 U.S. at 40, 112 L. Ed. 2d at 342, 111 S. Ct. at 329.

The *Sullivan* case, however, is inapposite to the case before us because it addresses the trial court's error in misdefining and thereby diluting the reasonable doubt standard. In contradistinction, the trial court's instructions and relevant circumstances at trial in the case before us, like those present in *Layhew*, informed the jury of the proper

standard to be applied, that of reasonable doubt; the trial court simply failed to give a general independent instruction on that burden of proof *sua sponte.*

*Sullivan* is therefore silent on the situation present in this case. The United States Supreme Court cases relied on by the *Layhew* court, *Taylor v. Kentucky* (1978), 436 U.S. 478, 56 L. Ed. 2d 468, 98 S. Ct 1930, and *Kentucky v. Whorton* (1979), 441 U.S. 786, 60 L. Ed. 2d 640, 99 S. Ct. 2088, were not discussed or even cited by *Sullivan.* *Taylor* and *Whorton* both involved the failure of the trial court to instruct the jury on the general presumption of innocence rather than the trial court's affirmative misdefining of the articulated standard the jury was to apply. We think that this distinction between affirmatively misinforming the jury of the applicable standard as opposed to the mere absence of a general reasonable doubt standard when other instructions conveying the reasonable doubt standard have been given to the jury is a dispositive one and consequently conclude that *Sullivan* does not serve to vitiate or undermine our supreme court's holding in *People v. Layhew* which calls for a totality of the circumstances approach to be applied.

Defendant's final contention is that the trial court erred in sentencing him. Specifically, defendant contends that the trial court improperly imposed an extended-term sentence of 50 years upon him for aggravated criminal sexual assault because he was 16 years old at the time of the crime when the statute in effect then expressly provided that such a sentence could only be imposed "upon any offender who was at least 17 years old on the date the crime was committed." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b).) Defendant also contends that the imposition of a 30-year sentence for home invasion was an abuse of the trial court's discretion.

■■■ The State concedes that the defendant was improperly sentenced to an extended-term sentence for aggravated criminal sexual assault. It argues, however, that this court should exercise its authority under Illinois Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) to reduce defendant's sentence to 30 years, the maximum sentence available at that time, instead of remanding the case for a new sentencing hearing. In the interest of judicial economy, the State argues that since the trial court found the circumstances of the offense sufficient to warrant the imposition of an extended-term penalty, it would undoubtedly assess a 30-year sentence on remand.

We should not assume that the trial judge will simply resentence defendant to the maximum sentence available, especially when there has been a significant period of time between when defendant's sen-

tence was imposed and its reversal on appeal. (See *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801 (when period of two years has elapsed between when defendant was convicted and when that conviction is reversed on appeal, case should be remanded to trial court for resentencing).) Considering that defendant was sentenced for this crime almost four years ago, the trial judge should have the opportunity to determine what, if any, additional modifications are necessary to his sentence. Although we recognize the need for judicial economy, we are also aware that the trial judge is in a better position to impose a sentence "consistent with the protection of the public, the gravity of the crime, and the rehabilitative needs of the defendant." (*People v. Jerrick* (1978), 62 Ill. App. 3d 914, 917, 379 N.E.2d 1295.) As the trial court is the more appropriate forum, we remand this case for resentencing on defendant's conviction for aggravated criminal sexual assault.

 With respect to defendant's claim that the trial court abused its discretion in sentencing him to 30 years for home invasion, the State initially contends that defendant waived this issue for purposes of review because he did not object at the sentencing hearing. Defendant, however, raised the same salient considerations at the sentencing hearing as he now does on appeal and has therefore properly preserved this issue for review. See *People v. Davilla* (1992), 236 Ill. App. 3d 367, 603 N.E.2d 666.

The sentencing of a defendant is within the sound discretion of the trial court (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606), and a reviewing court is reluctant to disturb the sentence imposed by a trial court when it is within the range set by the legislature, as is the case here. (*People v. Gaurige* (1988), 168 Ill. App. 3d 855, 522 N.E.2d 1306.) The trial court's determination of the appropriate sentence is based on a number of factors, including the circumstances surrounding the crime, the seriousness of the crime itself, defendant's general moral character and credibility, and defendant's age and criminal history. (*People v. Luna* (1992), 234 Ill. App. 3d 544, 600 N.E.2d 1212; *People v. Aguinaga* (1992), 231 Ill. App. 3d 153, 598 N.E.2d 984.) The weight to be given each of these factors depends on the particular circumstances of each case. *People v. D'Arezzo* (1992), 229 Ill. App. 3d 428, 602 N.E.2d 462.

Defendant contends that the trial court failed to take into account his age; rehabilitative potential, demonstrated by his pursuit of a GED while in jail and his lack of disciplinary incidents while incarcerated; and his lack of a serious criminal record, having only one prior arrest for disorderly conduct and no convictions. The foregoing factors must

be viewed, however, in the light of defendant's conviction for two rapes and home invasions. In one case, defendant threatened to kill the complainant, while in the other he threatened to hurt the complainant's two young children. Moreover, approximately 24 hours after committing one of these violent crimes, defendant felt the need to go out and commit violence again. Finally, we note that the trial judge, who was able to observe defendant's demeanor, indicated that the defendant showed no remorse for these violent acts. In light of these factors, we cannot say that the balance struck by the trial court in sentencing the defendant to 30 years for home invasion constituted an abuse of discretion. *People v. Halstead* (1987), 164 Ill. App. 3d 1, 517 N.E.2d 667.

For the foregoing reasons, we affirm defendant's convictions for home invasion and the aggravated criminal sexual assault. We reverse and remand, however, the trial court's sentence of defendant for aggravated criminal sexual assault in appeal No. 1—89—2086.

Judgment affirmed in part and reversed and remanded in part.

MURRAY and COUSINS, JJ., concur.